IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ZACHARY SPADA,                          :
                    Plaintiff           :
            v.                          : Case No. 1:20-cv-223-SPB-KAP
CAPTAIN RICHARD HOUGHTON,               :
*et al.*,                               :
                    Defendants          :

## Report and Recommendation

### Recommendation

I recommend that the pending motion for summary judgment, ECF no. 53, be granted, and this case ended.

### Report

Plaintiff Zachary Spada, an inmate in the Pennsylvania prison system familiar to the Court from Case No. 3:13-cv-113-KAP, Case No. 3:13-cv-256-KRG-KAP, Case No. 3:14-cv-26-KRG-KAP, Case No. 1:18-cv-273-SPB, Case No. 1:14-cv-107-JFM-SPB, Case No. 1:14-cv-299-SPB, Case No. 1:20-cv-298-SPB-RAL, Case No. 1:15-cv-202-SPB,  Case No. 1:18-cv-255-KRG-KAP, and Case No. 1:21-cv-158-SPB-KAP, submitted a complaint in August 2020 alleging federal and state law claims against employees of the Erie County Prison (Prison) as a result of the use of oleoresin capsicum (OC) spray against him on six occasions in September through November of 2018, when Spada was a pretrial detainee at the Prison. After screening of the complaint led to the dismissal of defendants not involved in the episodes of use of OC spray, colorable claims remained against the defendants who did use OC spray on Spada: Richard Houghton, Shawn Bolt, and Albert Wood. After discovery, defendants filed a motion for summary judgment and supporting documents, ECF nos. 53-57, to which Spada responded, ECF nos. 58-61, with a surreply by defendants, ECF no. 62. Key documents are Spada's deposition, ECF no. 54-1, his counterstatement of facts, ECF no. 59, and his affidavit, ECF no. 58.

#### *Legal standards*

A party moving for summary judgment bears the initial burden of pointing the district court to the basis in the record for its argument that there is no genuine issue of material fact. Celotex Corporation v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party does so, Fed.R.Civ.P. 56 then obliges the party opposing summary judgment to show by competent evidence that there is a genuine factual dispute, that is, that sufficient evidence exists so that a reasonable jury applying the relevant law could return a verdict for the

1

nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986). Where there is a factual dispute, all reasonable inferences must be drawn in favor of the nonmoving party, in this case the plaintiff. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). This does not mean that the burden of proof shifts to the defendants: Spada still has to show a genuine issue for trial under the governing law.

To state a claim for the excessive use of force, a pretrial detainee like Spada must show that the force purposely or knowingly used against him was objectively unreasonable. There is no subjective component. <u>Kingsley v. Hendrickson</u>, 576 U.S. 389, 396–97 (2015). Objective reasonableness is a case-specific finding that depends on the perspective of a reasonable corrections officer on the scene at the time of the use of force, taking into account the legitimate government interest in deciding what policies are appropriate to manage pretrial detention facilities. *See* <u>Florence v. Bd. of Chosen Freeholders of Cty. of Burlington</u>, 566 U.S. 318, 322–23, (2012) (In the course of approving strip searches of all detainees booked in two New Jersey county prisons, the Supreme Court observed "In addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security.") *See also id*. at 326 ("Maintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face.").

A nonexhaustive list of factors that bear on the reasonableness or unreasonableness of the force used includes the relationship between the need for the use of force and the amount of force used, the extent of the plaintiff's injury, any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. <u>Kingsley v. Hendrickson</u>, *supra*, 576 U.S. at 397. This is well-settled law. *See* <u>Smith v. Mensinger</u>, 293 F.3d 641, 648-49 (3d Cir.2002), *quoting* <u>Brooks v. Kyler</u>, 204 F.3d 102, 106 (3d Cir.2000)(balancing the need for use of force, the relationship between the need and the amount of force used, the extent of injury inflicted, the threat to staff and other inmates perceived by the corrections officers, and any efforts made to temper the severity of the force used.)

The focus in excessive force claims is on the use of force and not any injury, although as precedent uniformly recites the extent of injury is a relevant factor in deciding whether a use of force is excessive. Given the development of chemical sprays (CN, CS, OC gas), electric shock devices (tasers, stun guns), high decibel/low frequency acoustic devices (sound cannons), and impact devices (bean bag rounds, "rubber" bullets, water cannons), law enforcement officers now have numerous alternatives along the spectrum from using no force to using lethal force. Use of lethal force was, is, and hopefully always

will be a rarity, but it is an error to evaluate a nonlethal use of force with the unexamined assumption that the default choice is "no force" because historically that was the only alternative to lethal force. When evaluating whether a jury could find a particular use of nonlethal force excessive, a court must focus instead on events from the perspective of the law enforcement officers, asking what was the threat to order reasonably perceived by the officers and what were the available responses.

OC spray, considered by itself, is far down the spectrum of available nonlethal options. OC is a naturally occurring substance produced from the oily resin of cayenne and other peppers, and the same chemical reaction that makes hot peppers desirable in cooking or makes capsaicin cream useful as a pain reliever is why OC is used by law enforcement officers and civilians. The burning sensation from the spray causes incapacitation from lacrimation and swelling when it contacts the eyes and from swelling of the mucous membranes of the trachea when it is inhaled. The effects are, and are intended to be, painful and temporary. Because of its popularity as an alternative to older, more toxic (and in some cases banned) agents such as CS ("tear gas") and CN ("mace"), OC spray has been used an uncounted number of times in the last 30 years (and the Court can take judicial notice that in many jurisdictions OC spray is widely available for civilian use). For background reading, *see* "The Effectiveness of and Safety of Pepper Spray," NCJ 195739, available at the Department of Justice's Office of Justice Programs National Institute of Justice website. (A paper copy is appended to this report for the benefit of plaintiff.) Unsurprisingly, there is a substantial body of law specifically involving the use of OC spray by law enforcement officers. Precedent can be summed up as holding the use of OC to obtain compliance with a legitimate order does not violate any rights, but use of OC as a form of corporal punishment does.  *See* McCoy v. Alamu, 950 F.3d 226, 231 (5th Cir. 2020), *vacated on other grounds*, 141 S. Ct. 1364 (2021) (vacating a finding of qualified immunity for officer who intentionally used OC to spray an inmate in his cell without warning or provocation after a different inmate had thrown something at the officer). This is consistent with the longstanding principle that corporal punishment is not a permissible sanction within our constitutional system. For just two examples, see then-Judge Blackmun's opinion in Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir. 1968), outlawing use of flogging in Arkansas, and Hope v. Pelzer, 536 U.S. 730 (2002), declaring that it is clearly established law that punishing an inmate by hitching him to a post shirtless in the June sun of Alabama is cruel and unusual.

Applying that principle, it follows that using OC on an inmate locked in his cell who poses no threat to staff or inmates, even if no serious injury is caused, can be found by a jury to be corporal punishment and therefore to violate the Eighth Amendment. *See* Robinson v. Danberg, 673 Fed.Appx. 205, 212 (3d Cir. 2016). But this is true of a gratuitous punch or unjustified prolonged solitary confinement as well as of the gratuitous use of OC spray: the fact that OC spray is painful does not place it in a different

legal category from other nonlethal uses of force, although its action as a respiratory agonist when inhaled calls for care when the person sprayed has other conditions that would hamper breathing such as asthma or similar conditions, or is morbidly obese, or is in physical or postural restraints.

The fact that an inmate is no threat to physically harm another person also does not make the use of OC spray to obtain compliance with orders excessive. *See* Passmore v. Ianello, 528 Fed.Appx. 144, 148 (3d Cir. 2013)( In a case from the Erie County Prison, the court wrote "[B]efore Defendant Ianello resorted to using the pepper spray, he warned Passmore, giving him one more chance to comply. In light of these undisputed facts, the use of pepper spray was reasonable in these circumstances and the District Court properly granted the Defendants' motion.") *See also* Giles v. Kearney, 516 F. Supp. 2d 362, 369 (D. Del. 2007), aff'd, 571 F.3d 318 (3d Cir. 2009) ("[T]he use of force was justified in response to Giles defiant and argumentative behavior, as well as his repeated refusals to obey orders. By spraying capstun instead of using physical handling, Blades applied proportionate force to quell Giles' behavior."), *and see* Enoch v. Perry, 2020 WL 4057643, at *7 (W.D.Pa. July 20, 2020) (use of pepper spray on an inmate by an officer to secure compliance with an order was objectively reasonable, but the later use of the spray on the inmate when unconscious was not); Brown v. Beard, 2009 WL 10701467, at *12 (W.D. Pa. Mar. 9, 2009) (inmate did not comply with orders to submit himself to be handcuffed through the food slot, and a corrections officer administered a two-second burst of OC through the aperture in the cell door. A later burst of OC spray and a stun gun were used to obtain compliance with a strip search.)

As the history of McCoy v. Alamu illustrates, a second legal principle is important here: corrections officers are shielded by qualified immunity from liability for money damages when their conduct does not violate clearly established legal rights. *See* Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). If official defendants "reasonably but mistakenly conclude[]" that their conduct conformed to the law they are entitled to immunity. Hunter v. Bryant, 502 U.S. 224, 227 (1991) (*per curiam*). Qualified immunity therefore operates to additionally protect officers from liability at the "sometimes hazy border between excessive and acceptable force," unless they were on notice that their conduct was unlawful. Couden v. Duffy, 446 F.3d 483, 492 (3d Cir.2006) (Fourth Amendment), *quoting* Saucier v. Katz, 533 U.S. 194, 206 (2001). Another way of putting that is that to find a corrections officer, the officer had to have "fair warning" that his "specific acts were unconstitutional." Taylor v. Riojas, 141 S. Ct. 52, 53, 208 L. Ed. 2d 164 (2020)(*per curiam*).

On September 1, 2018, Spada arrived at the Prison. He had previously been in the state prison system, most recently at S.C.I. Houtzdale for several years while serving a previous sentence imposed for crimes also committed in Erie. ECF no. 54-1 at 10-11.

Houtzdale staff had notified Prison staff that Spada "claimed to be a sovereign citizen, claimed to be suicidal, and might otherwise be combative with staff upon his admission to the facility." ECF no. 54, ¶ 6.  It is not in dispute that Spada is mentally ill (in fact Spada alleged his mental illness as a basis for an attempted ADA claim in a civil suit he was prosecuting when he was committed to the Prison, and in a more recent habeas corpus petition as a claim that his misconducts should be excused because of his mental illness); according to defendants, Spada has a mental health diagnosis of Type I Bipolar Disorder. ECF no. 54 at 2. In his deposition, Spada stated, "When I am off my medication I frequently go what they call manic, having racing thoughts, inability to sleep, impulsiveness, restlessness.  Generally manic."  ECF no. 54-1 at 4.

Spada was a behavioral problem from the outset, and in fact was criminally charged with aggravated assault (he later pleaded guilty to aggravated harassment by a prisoner) for biting a corrections officer while he was being booked. *See* ECF no. 54-6. Later that day, Spada was sprayed with OC spray (the incident is not one which Spada claims is excessive, *See* ECF no. 54-1 at 17-20) for banging on his cell walls and barricading himself behind a mattress.  Defendants' Concise Statement of Material Facts lists numerous other misconducts at the Prison for which Spada was found guilty, including another criminal charge for Spada's conduct on day two in the Prison (September 2, 2018) in which Spada threatened a corrections officer and his family, referencing the officer's home address and his son by name. Spada later pleaded to disorderly conduct.  *See* ECF no. 54-1 at 20 and Exhibits, *passim*. Spada argues in his Counterstatement of Facts that these other episodes are irrelevant to the case. *See* ECF no. 59, ¶¶ 1, 6-25.  That is incorrect: any jury evaluating the use of force by Prison staff would have to consider the information available to them about what problems or potential problems Spada posed. Spada himself tacitly admits that his behavioral issues were real by explaining that they were due to medication dosages issues which were not corrected until after November 2, 2018. *See* ECF no. 59, ¶28; ECF no. 58, ¶20. Spada also admits that as early as September 4, 2018, he expressly told the Prison's deputy warden that he would be a model prisoner if he were housed as he desired but that there would be "an extraordinary incident every day" if he were not. ECF no. 54-1 at 25-26.

After the biting and barricading incidents Spada was placed in the Restricted Housing Unit.  *See* ECF no. 54, ¶¶ 8-18. Spada's disruptive behaviors continued there almost daily, and included loud singing and screaming, assault, throwing water on the floor, slapping the walls and shaking the bars of his cell, urinating and defecating on the floor and the walls of his cell, self-mutilation, harassment, refusal of orders, threats, destroying, defacing, or damaging property, and interfering with the duties of staff.  Spada argues that he was not aware of the Prison's rules against these activities because he destroyed his prison handbook upon receipt, ECF no. 59, ¶¶ 5, 54.  In most cases Spada admits to the noisemaking activity that corrections officers described, but complains that

the Prison was overly restrictive compared to what he had become accustomed to at Houtzdale. *See* ECF no. 58 ¶ 13. In Spada's own words, he was placed in the RHU there many times but even when he would kick the door to his cell repeatedly in defiance of orders to stop, "they still don't use OC spray." *See* ECF no. 58, ¶12.  Spada's position is that his interpretation of the policies at Houtzdale sets the standard for the Prison and "No inmate should be sprayed for verbally screaming [but] not causing a physical disturbance." *Id.* ¶ 20. As for banging on cell fixtures and surfaces, that is a customary form of aggression in Houtzdale called "bang[ing] each other out." ECF no. 58, ¶12. In fact, Spada explains his banging on cell fixtures as a "technique of banging when buttons aren't answered" he "learned" at Houtzdale. ECF no. 58 ¶15. According to Spada, OC spray was not used there even for "shit[ting] one another down," ECF no. 58, ¶12, another Houtzdale practice which, just as it sounds, is an inmate's use of feces or urine as weapons. In this connection, Spada admits that he defecated outside the toilet in his cell on numerous occasion, thus arming himself with potential weapons.

The first disputed use of OC spray was in the evening of September 4, 2018. *See* ECF no. 54, ¶¶ 31-38. Earlier that day, Spada had made a claim of sexual harassment in order to gain access to the prison hotline, which he used to attempt to call his grandmother. That evening, Wood said he observed Spada repeatedly banging on his cell gate and window with his hands and head.  Wood ordered Spada to stop and asked if Spada had any thoughts of hurting himself. According to Wood, Spada did not respond and resumed the banging, and Wood use a single burst of OC spray to Spada's face and head, at which point Spada ceased banging.  Spada admits he was banging (using only his hands) on the cell gate to get "help." ECF no. 59, ¶31, and states he stopped the banging and had turned and was walking away when Wood sprayed him. *See* ECF no. 54-1 at 29-30; ECF no. 58, ¶¶ 5-6.  Spada was taken to the medical unit for decontamination. Spada could not remember whether he admitted the behavior which led to the use of OC spray ("I fucked up… it's my fault) because he allegedly was in extreme distress (eyes burning, mucous spewing from mouth and nose) from the OC spray which, if his version of the facts were accurate, could only have hit him in the back of the head. ECF no. 58, ¶10. Spada asserts that if he had continued to bang it would not have mattered anyway because his cell had nothing in it he could destroy. ECF no. 58, ¶11 (Spada repeats this in subsequent incidents, *see* ECF no. 58, ¶20).

On the morning of October 3, 2018, Spada slammed his meal tray against his cell wall. *See* ECF no. 54, ¶¶ 64-70. Around noon, Spada was brought to the RHU conference room for purposes of observation while his cell was being inspected. When told to surrender his glasses and prison uniform, Spada engaged in a physical altercation with the correctional officers and bit one of them.  Someone sprayed Spada with OC spray to to gain control over him, though the record does not identify which staff member sprayed Spada.  Spada was immediately escorted to the prison shower for decontamination and

then returned to an observation cell and placed in a restraint chair. Spada later pleaded guilty to aggravated assault for biting the officer. Spada does not dispute these events but claims they are immaterial to the events later that day. ECF no. 59, ¶¶ 65-69.

Later that night, *see* ECF no. 54, ¶¶ 75-77, Spada again was banging on his cell and screaming.  Spada believes that he was sprayed on this occasion due to his screaming and the use of spray was excessive because in his view screaming is part of permissible conduct in the RHU. ECF no. 58, ¶17. He refused orders to stop screaming and according to defendants climbed on his cell desk and appeared to be tampering with the wall-mounted light fixture.  Houghton responded to the disturbance and ordered Spada to get down from the desk and Spada refused.  Houghton administered a burst of OC spray against Spada to gain his compliance.  This caused burning and stinging and made Spada cry; he thought Houghton was trying to kill  him and that he was going to die. ECF no. 58, ¶22. Spada was then removed from his cell for decontamination. Spada admits that he was screaming, but not standing on a desk or banging on anything, and asserts that Houghton used OC spray without warning. ECF no. 54-1 at 36-39. Spada later pleaded guilty to misconducts for damaging property and refusing orders in this episode, but Spada states that he pleaded guilty to a host of offenses without knowing what conduct they entailed. *Id.*

On October 3, 2018, Spada covered the observation camera in his cell with a sticker, and was issued a misconduct to which he pleaded guilty; he repeated this tampering with the camera lens on October 4, 2018. ECF no. 54-1 at 39-40. On October 8, 2018, Spada smeared his cell observation camera with cream he had obtained from the medical department. When he responded to the cell, Houghton (Spada admits Hughton had told him not to cover his cell camera, ECF no. 54-1 at 42, but due to his mental illness he could not remember that instruction on October 8, 2018, ECF no. 59, ¶83) used a short burst of OC spray into Spada's cell.  Spada was escorted to the gym shower for decontamination and denied physical injury.  When Spada was charged with institutional offenses he replied, "He didn't warn me.  He just sprayed me." ECF no. 54, ¶ 89; ECF no. 58, ¶27. Spada's position is that it was objectively unreasonable for Houghton to use OC spray "because no warning was given directly before Houghton used OC and an inmate is entitled to know what punishment a given action will carry." ECF no. 59, ¶84.  *See also* ECF no. 58, ¶¶ 31-32 (explaining he was not "actively resisting" because no order had been given.) Spada's asserted injury from this third contested use of spray was the same burning pain lasting several days that OC spray always caused, *see* ECF no. 58, ¶33, and ECF no. 58, ¶48, plus having to go through the decontamination process, which Spada calls "torture" because he claims water "activates" the oil-based molecules of oleoresin capsicum.  ECF no. 59, ¶34; ECF no. 58, ¶49. Spada does not explain what other decontamination process could be used. He admits that he previously denied any injury and that he refused an offer to have his eyes rinsed out in addition to the shower. ECF no.

54-1 at 43.

The fourth and fifth claims are based on events of October 29, 2018. ECF no. 54, ¶¶ 100-105. The previous day Spada had flooded his cell by stuffing his mattress in the toilet; he also tampered with the electrical outlet and the light. ECF no. 54-1 at 44-47. On October 29, Deputy Warden Holman told Spada there would be no more final chances or warnings, but Spada does not recall that OC spray was mentioned. In any case, later that morning Spada was singing and yelling in his cell, and he ripped his paper gown and stuffed it in the cell toilet. Bolt told him to quit putting his gown in the toilet. According to Bolt, Spada stopped stuffing the toilet but continued to yell and sing and repeatedly struck his sink with his fists and arms. Spada admits the stuffing and yelling but denies striking his sink, and claims Bolt sprayed him to punish him for screaming after he removed the paper gown from the toilet and had stopped screaming and laid down in his bunk. ECF no. 58, ¶¶36, 38-39. A team took Spada to the gym shower for decontamination.

After decontamination on October 29, 2018, Spada was placed in an isolation cell at the gym to cool down. During that time, Spada asked to use the bathroom, and while there Spada made a "urine bomb" by removing his new paper gown, placing it over the toilet, and urinating into it. Houghton came to the scene and ordered Spada to "dump it out." When Spada failed to comply Houghton used a burst of OC spray on Spada. Spada was taken to the shower for decontamination once again, and returned to the RHU. ECF no. 54, ¶¶ 107-113. Spada, for his part, admits to urinating in his gown, ECF no. 58, ¶42 but avers that he couldn't hear Houghton's orders and thought Houghton might only be telling him to take the gown out of the toilet because that was what Bolt had told him to do earlier in the day. ECF no. 54-1 at 50, 52. When Spada told Houghton that Spada couldn't hear him, Spada says Houghton opened the tray slot in the door and used OC without further warning, ECF no. 54-1 at 51-52. Spada believes that the use of spray was excessive because states he dropped the gown just before being sprayed and Houghton could have given him clearer orders. ECF no. 58, ¶42.

On November 1, 2018, Spada defecated on the floor of his cell; he pleaded guilty to the misconduct issued to him. ECF no. 54-1 at 52-53. The very next day, November 2, 2018, Wood observed Spada playing with feces in his cell. ECF no. 54, ¶¶ 117-122. Spada had smeared feces across his cell window and walls but according to Spada not outside of the cell. ECF no. 58, ¶46. Wood says he ordered Spada to position himself to be placed in handcuffs, an order that Spada refused. Wood used OC spray and Spada was extracted from his cell to be decontaminated. Spada said Wood came to the unit, saw what Spada had been doing, and without any order to be handcuffed simply sprayed him for ten seconds without any preamble. ECF no. 58, ¶¶46-47; ECF no. 54-1 at 54-55. On this occasion Spada thought he was going to die, and any admissions of fault he might have

made were attempts to keep the officers from killing him. *Id*. He believes that use of spray was excessive because locked in his cell he was no "severe" threat to anyone else. ECF no. 58, ¶47.

Spada admits that the misconduct reports generated at the Prison were accurate, except for the ones generated in connection with the incidents which he claims constituted the use of excessive force. ECF no. 54-1 at 56-57. He does not claim that, much less explain how, any use of OC spray injured him other than causing him temporary pain that he claims lasted up to a few days after decontamination. He does not claim to have had any respiratory conditions contraindicating use of OC spray, and his subjective belief that on some occasions "it felt like" a corrections officer used a whole can of OC spray on him (and then walked into that same environment) does not constitute evidence that an excessive amount was used on those occasions because each time OC spray was used Spada claims to have suffered the same injuries.

This case is one of the few where recitation of the disputed facts alone should make it clear that no jury faithfully following the law could ever find the defendants liable. Even if a jury believed Spada's claims that every single time just before the OC spray was used he had stopped the conduct that he believed the corrections officers were trying to stop (although they had given him no orders), no jury could find the use of bursts of OC spray followed by decontamination to be exaggerated responses to the almost nonstop threat to order that Spada presented. A jury would be bound to consider, in assessing the threat perceived by defendants, that not many pretrial detainees commit new criminal offenses against corrections officers on day one and day two of pretrial detention. A jury might be found that would believe Spada's assertions Wood, Bolt, and Houghton were "trigger-happy" compared to other corrections officers he had met in his cumulative ten years of incarceration. ECF no. 58, ¶25. A jury might even resolve credibility disputes in Spada's favor about whether a specific order had been given before spray was used. But Spada's belief that any use of OC spray when he disputes its necessity is *per se* excessive, or that he was no threat on particular occasions, are not issues of fact.

Likewise, Spada's beliefs that screaming was permitted or part of life in the RHU or not worthy of an attempt to stop it, or that he could not destroy anything in his cell if he tried, or that locked in his cell he was not a "severe" danger, or that covering a camera was no big deal, do not create an issue of fact. A jury could not find the conduct of defendants improper based on Spada's claim, even if true, that the DOC has different policies. As Spada recognizes, he was in a large (he estimated 700 inmates) county prison, not a DOC facility ECF no. 58, ¶31. The policies useful for managing a population combining pretrial detainees (some of them in prison for the first time and ultimately to be found not guilty of anything and some of them mentally ill violent recidivists like Spada) alongside of short-term sentenced offenders are different in kind from those in a

9

DOC facility, and Spada's disagreement with those policies is irrelevant.

Even the most credulous jury that could be seated could not draw the inferences from the facts that Spada needs to avoid summary judgment. As one example, consider the encounter with Houghton on October 29, 2018. Spada, admittedly having weaponized his clothing, suggests that Houghton was in the wrong for opening the slot and spraying him, when Spada simply couldn't understand Houghton's order because the cell door was closed. This is a child's argument. In Spada's case it is a malicious child's argument: no jury could find Houghton liable even if Houghton sprayed Spada without warning instead of exposing himself to a urine bomb in order to ensure that Spada could not later claim not to have heard Houghton clearly. The same thing goes for September 4, 2018 and other instances when a jury could believe Spada's claim that he did not hear a command or had heard it and had just complied with it: no officer need sit by Spada's cell round the clock to ensure that Spada did not resume his disruptive conduct. Use of OC gas in such a situation, assuming a jury believed Spada, would be as a temporary incapacitant, not a punishment.

As for Spada's suggestion that any use of OC spray when was locked in his cell was excessive, no jury would be allowed to accept Spada's underlying legal principle that the only threat to order permitting the use of OC spray is an ongoing physical attack such as Spada's biting of a corrections officer. It is beyond dispute that Spada was a direct physical threat even locked in his cell. In his first week, Spada was defecating outside his toilet or stuffing things in his toilet. The need to check the cell (or clean it) as a result of Spada's conduct would have made Spada's temporary removal from the cell necessary: flooding cells and weaponizing bodily wastes are direct physical threats. Given Spada's assault on a corrections officer on day one, any use of OC spray to manage the ongoing threat posed by Spada's potential use of bodily waste as a weapon could never be characterized as excessive. Use of OC gas in such a situation, even assuming a jury believed Spada, would be as an incapacitant, not as punishment.

Further, defendants could reasonably use OC spray to stop behaviors that endangered only Spada, with or without giving him a verbal command first. The Court has, just as I have had, numerous cases where the legal claim is based on the inmate's assertion that corrections officers failed to protect the inmate from deliberately harming himself. Every use of OC spray during an incident when a corrections officer might reasonably have believed Spada could be endangering himself, whether by climbing on desks, tampering with lights, defecating outside a toilet, covering a camera, or stuffing a gown in a toilet, is justified by the need to get Spada to stop that behavior. Given Spada's express threat that he would cause an incident every day to get his own way, a jury, even if it believed Spada's claim to "only" be screaming, would be compelled to accept that the defendants had a situation that justified or even required them to intervene to interrupt

Spada's self-harming or potentially self-harming behavior.

Finally, no jury could find in Spada's favor on Spada's claims that OC spray was excessive for the episodes involving "only" screaming. A jury would be instructed that the Prison and not Spada sets Prison policy. Excessive noise, which Spada himself admits is intended as and used as a weapon, harms other inmates. Defendants have a duty to protect them too. Not only that, but defendants have an interest in interrupting escalation from "screaming" to "banging" to "shitting" which Spada himself explained as threats that are endemic in the RHU.

There is no need to discuss qualified immunity here because defendants were at no time even close to the sometimes hazy line separating excessive from reasonable uses of force.

I do not address the additional defense that on some occasions Spada allegedly failed to exhaust his administrative remedies. For one thing, precedent involving Spada himself would require that on this record I should hold an evidentiary hearing. *See* <u>Spada v. Martinez,</u> 579 Fed.Appx. 82 (3d Cir. 2014), *opinion after remand*, 663 Fed.Appx. 112 (3d Cir. 2016). That is just a waste of time.

I also will not belabor Spada's tag-along claim that the use of OC spray (but only on those occasion when it was also was an excessive use of force) was retaliation for his filing of grievances and therefore in violation of the First Amendment. No reasonable jury could believe it because it is simply preposterous. Spada himself acknowledges every single disruptive incident took place, even when he disputes the details and the bona fides of the defendants' response to each incident. Spada also acknowledges other uses of OC spray that Spada does not claim were retaliatory. The claim that in the midst of responding to one of these six incidents (that sometimes took place on the same day as nonretaliatory uses of OC spray) any corrections officer was "really" thinking about Spada's grievances (and not Spada's assaults on corrections officers or one of the other incidents where the use of OC spray was justified) and motivated to make the decision to use OC spray by the grievance and not the incident itself cannot be taken seriously even as a bad case of *post hoc ergo propter hoc* reasoning.

Pursuant to 28 U.S.C.§ 636(b)(1), the parties can within fourteen days file written objections to this Report and Recommendation. In the absence of timely and specific objections, any appeal would be severely hampered or entirely defaulted. See EEOC v. City of Long Branch, 866 F.3d 93, 100 (3d Cir.2017) (describing standard of appellate review when no timely and specific objections are filed as limited to review for plain error).

DATE:_ July 22, 2022 _____                   _____
                                                Keith A. Pesto,
                                                United States Magistrate Judge

Notice by ECF to counsel of record and by U.S. Mail to:

    Zachary Spada NX-7892
    S.C.I. Houtzdale
    P.O. Box 1000
    209 Institution Drive
    Houtzdale, PA 16698-1000